**Spencer TUNICK, Plaintiff–Appellee,**

**v.**

**Howard SAFIR, in his official capacity as the Police Commissioner of the City of New York, and the City of New York, Defendants–Appellants.**

**Docket No. 99–7823**

United States Court of Appeals, Second Circuit.

Argued: Sept. 13, 1999

Decided: March 24, 2000

Dissent Filed: April 13, 2000.

Ronald L. Kuby, New York, N.Y. (Daniel M. Perez, Law Offices of Ronald L. Kuby, Arthur Eisenberg, Norman Siegel, Christopher Dunn, New York Civil Liberties Union Foundation, on the brief), for Plaintiff–Appellees.

Stephen J. McGrath, Deputy Chief, Appeals Division, Corporation Counsel of the city of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel of the City of New York, Leonard Koerner, Alan Beckoff, of counsel, on the brief), for Defendants–Appellants.

Before: VAN GRAAFEILAND, CALABRESI, and SACK, Circuit Judges.

CALABRESI, Circuit Judge:

Defendants Howard Safir, in his official capacity as the Police Commissioner of the City of New York, and the City of New York (collectively "the City") appeal from the grant of a preliminary injunction by the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*). The district court prohibited the City from interfering with a proposed photo shoot of 75 to 100 nude models arranged in an abstract formation, to be conducted by plaintiff Spencer Tunick on Sunday, July 18, 1999, between 5:30 a.m. and 6:30 a.m. in a residential Manhattan neighborhood. The City contends that the injunction must fall because New York state law prohibits public nudity, *see* N.Y. Pen. Law § 245.01 (McKinney 1989), and the promotion thereof, *see id.* § 245.02, and because the exemption[1] contained within the Penal Law does not apply to plaintiff's proposed photo shoot.

On July 17, 1999, a three-judge panel of this court stayed the preliminary injunction and calendared this appeal for expedited review. On consideration of the briefs, appendix, record, and oral argument, we have concluded that we should certify the following questions to the New York Court of Appeals: (1) whether a photographic shoot involving 75 to 100 nude models arranged in an abstract formation on a public street constitutes entertainment or performance in a "play, exhibition, show or entertainment" within the meaning of the exemption to N.Y. Pen. Law § 245.01 and § 245.02; (2) if the an-

---

1. Since both § 245.01 and § 245.02 exempt "any person entertaining or performing in a play, exhibition, show or entertainment," we refer to the identical exemptions in these provisions in the singular.

swer to the first question is yes, whether the exemption to N.Y. Pen. Law § 245.01 and § 245.02 is limited to indoor activities; and (3) if the answer to the first question is no, or if the answers to the first and second questions are both yes, whether N.Y. Pen. Law § 245.01 and § 245.02, so interpreted, are valid under the Constitution of the State of New York.

## BACKGROUND

Plaintiff Spencer Tunick is an artist internationally recognized for his photographs of nude bodies in public space. His curriculum vitae includes a long and impressive list of solo and group exhibitions. He has orchestrated numerous nude photo shoots in Manhattan without a permit from the City.[2] As a result of these actions, he has been arrested on five occasions. Charges in all of those cases were ultimately dismissed. Tunick obtained a permit from the City for a recent photo shoot involving clothed models, to take place on June 6, 1999. Police were present, and they made clear that anyone who disrobed would be arrested. The models remained clothed, and the photo shoot proceeded.

In July 1999, Tunick applied to the City for two permits to conduct a photo shoot on Madison Street, between Catherine and Market Streets, from 5:30 a.m. to 6:30 a.m. on Sunday, July 18, 1999. The neighborhood is predominantly residential. The applications indicated that 75 to 100 nude models were to be arranged in an abstract formation and that the duration of the actual shoot would be no more than five minutes. The conditions described in the two permit applications were identical, except in one regard. In the first, the models would be nude; in the second, clothed. The City denied permission for the nude photo shoot but granted the permit for the clothed shoot.

Plaintiff filed this complaint on July 13, 1999. Alleging that he had been arrested for arranging nude photo shoots in the past, that the City had prevented him from photographing nude models on June 6, 1999, and that the City was likely to interfere with the planned photo shoot on July 18, 1999 if the models were nude, he claimed that defendants violated his rights under, *inter alia*, the First Amendment. He asserted that his artistic expression was constitutionally protected and emphasized that, although New York state law criminalizes public nudity, the proposed photo shoot fell under the statutory exemption for "a play, exhibition, show or entertainment." N.Y. Pen. Law §§ 245.01, 245.02. Tunick sought preliminary and permanent injunctive relief. On July 16, 1999, the district court granted a preliminary injunction prohibiting the City from interfering with the nude photo shoot on Sunday, July 18, 1999, as described in the permit application. The court below found that plaintiff had established a substantial likelihood of success on the merits of his claim both because nude photography was constitutionally protected artistic expression and because it fell under the exemption to § 245.01 and § 245.02.[3]

2. Under the New York City Charter, the City has the authority to issue permits for the "taking of motion pictures, and for the taking of photographs and for the use or operation of television cameras and/or any other transmitting television equipment in or about city property, or in or about any street, park, marginal street, pier, wharf, dock, bridge or tunnel within the jurisdiction of any city department or agency or involving the use of any city owned or maintained facilities or equipment." N.Y. City Charter § 1301(1)(r),

3. Judge Van Graafeiland has indicated that he takes the view that this appeal is now moot

and that he will file an opinion to that effect at a later time. We respectfully disagree. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). It is certainly the case that the preliminary injunction, as issued by the district court, prohibited the City from interfering with Tunick's artistic endeavors on July 18, 1999, a date now some months past. Plaintiff, however, maintains an ongoing interest in taking the proposed photograph. It is therefore clear that July 18, 1999 was not specified in the preliminary

## DISCUSSION

### I.

We review a district court's grant of a preliminary injunction for abuse of discretion. *See Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68 (2d Cir.1999). Because this case involves First Amendment rights, this Court must make an independent examination of the record as a whole, and cannot defer to the factual findings of the court below. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

In order to obtain a preliminary injunction, a party must establish irreparable harm and either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits, with a balance of hardships tipping in favor of the party requesting the preliminary injunction. *See Otokoyama Co. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999). In this case, however, plaintiff seeks a mandatory injunction, that is, he asks to "stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996) (quoting *Plaza Health Labs, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)) (internal quotation marks omitted), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997). He therefore must satisfy "the more rigorous likelihood-of-success standard." *Id.* In other words, Tunick must establish a clear or substantial likelihood of success on the merits. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995).

Because violations of First Amendment rights are presumed irreparable, *see Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), "the very nature of [plaintiff's] allegations" satisfies the requirement that he show irreparable injury. *Bery,* 97 F.3d at 694. The only issue in this case, therefore, is whether Tunick has established a clear or substantial likelihood of success on the merits.

### II.

Although this case initially arose out of plaintiff's application for a photography permit from the City, it now turns entirely on the prohibition against public nudity contained in New York state law, and not on the City's licensing regime.[4] The injunction issued by the district court prohibited the City from interfering with the proposed photo shoot; it did not require the City to issue Tunick a permit. Perhaps because of this, the City makes no defense of its permitting scheme. More importantly, the City has repeatedly and expressly abandoned any argument based on its possible right to impose time, place, or manner restrictions on the shoot.

---

injunction due to any uniqueness in that date. Rather, the injunction described a discrete period of time on a single day so that Tunick would not be free to stage large scale shoots of nude models whenever he chose. Given that the City continues to assert that it will arrest Tunick if his models disrobe in public and that Tunick continues to seek to take the nude photograph, we find that the parties maintain a legally cognizable interest in the outcome of this case. Moreover, a three-judge panel of this court issued a stay on July 17, 1999. This stay of the preliminary injunction by itself saves the controversy from mootness. *Cf. Arthur v. Manch,* 12 F.3d 377, 380–81 (2d Cir.1993) (appeal of a time-sensitive district court judgment was moot where the relevant date had already passed and appel-

lant had failed to seek a stay pending expedited appeal).

4.   The New York City Charter authorizes the City to issue permits for photography conducted in public spaces. *See* N.Y. City Charter § 1301(1)(r). And the City's Administrative Code makes it unlawful for any person to take photographs in public spaces without such a permit. *See* N.Y. City Admin. Code § 22–205. Because the validity of the City's permitting system is not at issue, we do not address the implications of an ordinance that may make unlawful the actions of the myriad photographers, casual or professional, who take pictures in New York City every day, many of them, no doubt, without official authorization.

The City's limited position in this court has instead been that it cannot permit the photo shoot to proceed (i.e., that it must interfere with the shoot by arresting Tunick and the models) because the state law prohibiting public nudity bars nudity of the sort proposed by plaintiff. Specifically, the City maintains that the exemption to the ban on public nudity applies only to "performances or exhibitions that [take] place indoors before audiences." Appellant's Brief at 14. Because, the City contends, the photo shoot is not a performance or exhibition of the kind contemplated by the statute's exemption and because it is not scheduled to occur indoors, Tunick's activity falls squarely within the statute's proscription.[5]

The City, however, has cited no decision in support of its narrow interpretation of the statutory exemption, and this court has found only one case, by a municipal court, that appears to have interpreted the statute in the manner suggested by the City. In *People v. Wilhelm*, 69 Misc.2d 523, 330 N.Y.S.2d 279 (1972), the City Court of Buffalo analyzed an earlier version of the statute, containing the same exemption as that in the current version, and found the "attempted photographing of a nude female" not exempt where there was "[n]o claim ... that the posing or photographing itself was intended to be an exhibition or showing" and there was no audience "invited to view the photographing." *Id.* at 280–81. In this case, by contrast, plaintiff does indeed claim that "[t]he poses struck by the models and the scenes, as arranged by Mr. Tunick, are performances and exhibitions in their own right." Appellee's Brief at 28. And plaintiff's counsel at oral argument stated Tunick's willingness to invite the public to view the photo shoot if that would make the shoot lawful. Significantly, the court in *Wilhelm*, after reading the exemption narrowly, held the statute,

as applied to the defendant before it, to be unconstitutional under the New York constitution. *See id.* at 284.

Tunick, arguing instead that his photo shoot is indeed exempt, cites another municipal court decision, *People v. Gilmore*, 120 Misc.2d 741, 468 N.Y.S.2d 965 (1983). In *Gilmore*, a bar owner who had been prosecuted for allowing women to walk naked through his establishment raised an overbreadth challenge to § 245.02. *See id.* at 746, 468 N.Y.S.2d 965. The City Court of Mount Vernon reasoned that the statute was not overbroad and stated, in passing, that "persons engaged in the photographing of nude women ... are not threatened by section 245.02 of the Penal Law." *Id.*

Unfortunately, there are no decisions of the New York Court of Appeals or even of the Appellate Division that interpret the exemption. In fact, New York's highest court appears to have construed the statute, or its predecessor, on only three occasions—none dispositive of the instant case. *See People v. Santorelli*, 80 N.Y.2d 875, 587 N.Y.S.2d 601, 600 N.E.2d 232 (1992) (construing the statute not to prohibit women from exposing their breasts in a public park); *People v. Hollman*, 68 N.Y.2d 202, 507 N.Y.S.2d 977, 500 N.E.2d 297 (1986) (finding the statute constitutional as applied to a nude sunbather who raised a First Amendment claim); *People v. Price*, 33 N.Y.2d 831, 351 N.Y.S.2d 973, 307 N.E.2d 46 (1973) (per curiam) (finding the statute, which was "aimed at discouraging 'topless' waitresses and their promoters," not to be applicable to the "noncommercial, perhaps accidental, and certainly not lewd, exposure" alleged in the case before it).

We are, therefore, faced with a situation in which the proper reading of a state statute and, once that law has been properly interpreted, its validity under the

5. Sections 245.01 and 245.02 of the New York Penal Law authorize local governments to enact more restrictive anti-nudity ordinances and thereby eliminate within their own jurisdictions the exemption for plays and exhibitions. New York City has enacted no such additional legislation, and so the only limitations on public nudity applicable to this case are those contained in state law.

state constitution are issues that are crucial and perhaps determinative of the entire case before us, but in which we have no significant help from state courts.[6] If the New York Court of Appeals holds that the New York statute does not bar Tunick's photo shoot, that decision would resolve this case. The same would be so if the Court of Appeals holds that the statute applies, but that, so interpreted, it violates the New York constitution. If, however, New York's highest court rules that the statute does prohibit the shoot, and that it may do so under New York constitutional principles, the issue of the federal constitutional validity of the statute would be squarely presented. All this, we repeat, is so because the City unequivocally conceded at oral argument that Tunick would be *entitled* to the injunction if either (1) the statute exempts the proposed photo shoot or (2) the statute does ban the photo shoot but is, as a result, unconstitutional.

Accordingly, at oral argument, we asked counsel for both parties whether this case was suitable for certification to the New York Court of Appeals. In letter briefs submitted to this court, the City argued that certification would be appropriate. Tunick, however, maintained that the absence of any "genuine doubt" over the scope of the state law exemption compels a decision by this court on the state law question. Appellee's Letter Brief at 2. For reasons that require considerable amplification, we conclude that certification is warranted.

### III.[7]

Three years ago, the Supreme Court in *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), urged the federal courts of appeals to use certification in order to avoid deciding constitutional questions unnecessarily or prematurely. In *Arizonans,* the plaintiff, a state employee fluent in English and Spanish, challenged an amendment to the Arizona Constitution declaring English to be the official state language. *See id.* at 50, 117 S.Ct. 1055. Before the trial occurred in the district court, the Arizona Attorney General issued a formal opinion interpreting the amendment. *See id.* at 52, 117 S.Ct. 1055. Although the amendment mandated that "official acts of government" be performed in English, the Attorney General took the position that state employees could nevertheless use other languages "to facilitate the delivery of governmental services." *Id.* (quoting Ariz. Attorney General Op. No. I89–009) (internal quotation marks omitted). The district court rejected the Attorney General's limiting construction as "advisory" and "simply at odds with [the amendment's] plain language." *Yniguez v. Mofford,* 730 F.Supp. 309, 315 (D.Ariz. 1990). It also declined the defendants' invitation to abstain under the *Pullman* doctrine. *See id.* at 316 (citing *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)).

The district court then found the amendment overbroad, in violation of the First Amendment. *See id.* While the case was pending on appeal, the plaintiff resigned from her position in state employment. *See Arizonans,* 520 U.S. at 59, 117 S.Ct.

---

**6.** As noted above, there is no decision of the New York Court of Appeals on point. There is only language in the opinions of two municipal courts on the question of whether nude photography is banned by the statute, and these courts express divergent views. *Compare Wilhelm,* 330 N.Y.S.2d at 280–82 (interpreting the statute to prohibit nude photography, but finding the statute, as applied to nude photography, unconstitutional), *with Gilmore,* 120 Misc.2d at 746, 468 N.Y.S.2d 965 (noting that the statute did not prohibit nude photography). Similarly, there is no indication from the Court of Appeals whether, if the statute does in fact prohibit Tunick's proposed photo shoot, it is valid under the New York constitution.

**7.** The analysis in Sections III through V of this opinion does not necessarily represent the views of the other members of this panel, since (albeit for different reasons) their proposed dispositions of the case would obviate the need to reach the issues here discussed.

1055. The Ninth Circuit, nevertheless, rejected the suggestion that the case was moot, *see Yniguez v. State of Arizona,* 975 F.2d 646, 648 (9th Cir.1992), and affirmed the finding of the district court that the amendment was unconstitutional, *see Yniguez v. Arizonans for Official English,* 42 F.3d 1217 (9th Cir.1994).

On petition for certiorari, the Supreme Court found the case moot, in view of the plaintiff's shift from public to private employment. *See Arizonans,* 520 U.S. at 72, 117 S.Ct. 1055. It did not, however, stop there. Instead, it proceeded to vacate the judgment below, a result that is not required as a matter of course.[8] It did this, it said, because of the "federalism concern" raised by the decisions of the federal district court and of the court of appeals to interpret the Arizona law themselves. *Id.* at 75, 117 S.Ct. 1055. Those courts had "ruled out certification primarily because they believed [the state amendment] was not fairly subject to a limiting construction." *Id.* at 77, 117 S.Ct. 1055. But "[g]iven the novelty of the question and its potential importance to the conduct of Arizona's business, plus the views of the Attorney General and those of [the amendment's] sponsors, the certification requests merited more respectful consideration than they received in the proceedings below." *Id.* at 78, 117 S.Ct. 1055. Accordingly, the Court found that the "equitable solution" was to expunge the judgment finding the English-only amendment unconstitutional. *Id.* at 75, 117 S.Ct. 1055.

"Certification," the Supreme Court stated,

> covers territory once dominated by a deferral device called *"Pullman* abstention".... Designed to avoid federal-court error in deciding state-law questions antecedent to federal constitutional issues, the *Pullman* mechanism remitted parties to the state courts for adjudication of the unsettled state-law is-

sues.... [¶] Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.

*Id.* at 75–76, 117 S.Ct. 1055. The Supreme Court emphasized that certification was particularly appropriate in *Arizonans* because it would have enabled the courts below to adhere to the " 'cardinal principle' " that "[f]ederal courts, when confronting a challenge to the constitutionality of a federal statute ... 'will first ascertain whether a construction ... is fairly possible' that will contain the statute within constitutional bounds." *Id.* at 78, 117 S.Ct. 1055 (quoting *Ashwander v. TVA,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, *J.,* concurring)) (second ellipsis in *Arizonans* ).

*Arizonans* made quite clear that, in the eyes of the Supreme Court, the device of certification provides all the benefits of *Pullman* abstention (deference in a federal system to state courts on questions of state law and statutory interpretations that avoid constitutional difficulties), while reducing greatly its drawbacks (delay and cost). *See id.* at 76–78, 117 S.Ct. 1055. The teaching of *Arizonans,* therefore, is that we should consider certifying in more instances than had previously been thought appropriate, and do so even when the federal courts might think that the meaning of a state law is "plain." *See id.* at 76, 117 S.Ct. 1055.

## IV.

At the same time, *Arizonans* does not and cannot mean that we must certify whenever (a) a plaintiff raises a federal constitutional challenge to state law in federal court, (b) the state's highest court has not interpreted the statute, and (c) the

---

8. Vacatur is not required in every case that becomes moot on appeal, but instead turns on the facts of each case. *See U.S. Bancorp*

*Mortgage Co. v. Bonner Mall Partnership,* 513 U.S. 18, 23–24, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

constitutional question could conceivably be avoided by some saving interpretation. Thus, shortly after *Arizonans,* in the right-to-die cases, the Supreme Court did not vacate and remand the decisions of two different courts of appeals, involving the meaning of two state statutes (one very old and the other very new) that had never been interpreted by the state courts, and instead reached the merits of the constitutional questions raised by the two laws. *See Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997). It did this despite the concession of the parties that, under certain interpretations, the statutes would avoid constitutional challenge. *Compare Quill v. Vacco,* 80 F.3d 716, 718 (2d Cir.1996) ("The physicians contend that each statute is invalid *to the extent* that it prohibits them from acceding to the requests of terminally-ill, mentally competent patients for help in hastening death." (emphasis added)), *rev'd, Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834, *with id.* at 732, 117 S.Ct. 2258 (Calabresi, *J.,* concurring) (noting that the New York Court of Appeals had never clarified, and the legislative history cast some doubt upon, the question of whether the New York ban on assisted suicide, first enacted in 1828, was "ever meant to apply to a treating physician"). The question therefore arises—after *Arizonans, Glucksberg,* and *Quill,* when is certification appropriate in federal constitutional litigation involving state statutes?[9]

A.

In answering this question, we look first to the *Pullman* doctrine for guidance. This is so because, although *Pullman* abstention involves problems that certification may avoid or reduce, it still remains the doctrine whose purpose is most proximate to that of certification in cases concerning the federal constitutional validity of state laws.

Intended to "further[ ] the harmonious relation between state and federal" courts, the *Pullman* doctrine encourages federal court abstention on unsettled questions of state law that are antecedent to federal constitutional questions. *Pullman,* 312 U.S. at 501, 61 S.Ct. 643. By abstaining, federal courts can avoid both unnecessary constitutional decisions and potentially erroneous determinations of state law. *See id.* at 498–99, 61 S.Ct. 643. Abstention is not appropriate, however, where the meaning of a state statute is clear on its face. *See Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).

Significantly, *Pullman* has not been allowed to develop to its logical end: if the premise of the doctrine were simply that the federal courts should abstain whenever a federal constitutional decision could be avoided by interpretation of an unclear state statute, in theory, any case that presented an unclear state statute should be a candidate for abstention. It would then follow that *Pullman* abstention would greet almost all vagueness challenges to a state law. *See* 17A Charles A. Wright,

---

9. The issue is a different one from the question of when certification is appropriate in diversity cases. *See Liriano v. Hobart Corp.,* 132 F.3d 124, 132 (2d Cir.1998) ("Certification is particularly appropriate when the state's highest court has cast doubt on the scope or continued validity of one of its earlier holdings, or when there is some law in the intermediate state courts, but no definitive holding by the state's highest tribunal."); *McCarthy v. Olin Corp.,* 119 F.3d 148, 153–54 (2d Cir.1997) (finding sufficiency of guidance in state caselaw to be determinative of whether a federal court should certify in diversity case). Uncertainty in state law is central to both situations. *See id.* and *infra* Part IV.E. But what is in play in diversity situations, *see id.* at 157 (Calabresi, *J.,* dissenting) (noting that certification in diversity cases serves to avoid the evil "of forum shopping that *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 73–77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), was intended to prevent"), is quite different from what is involved when the validity of a state statute under the federal constitution is at stake. Accordingly, considerations relevant to certification in one context do not necessarily control in the other.

Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4242, at 45 (2d ed. 1988) ("The argument has been made that [a vagueness] challenge necessarily requires abstention, since if the federal court were to go to the merits and strike down the statute as vague this in itself would show the meaning of the statute is uncertain and that a state court should first be permitted to give it a limiting construction.").

The Supreme Court, instead, definitively rejected this possibility in *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), in which it found a Washington statute requiring public employees to take loyalty oaths to be unconstitutionally vague. Declining the defendants' invitation to abstain, the Court noted that *Pullman* "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law." *Id.* at 375, 84 S.Ct. 1316. Rather, the determination of whether to abstain is to "be made on a case-by-case basis." *Id.* Deferral to the state court, the Supreme Court emphasized, is appropriate in those circumstances where the state statute is susceptible of an interpretation that "would eliminate the constitutional issue and terminate the litigation." *Id.* at 377, 84 S.Ct. 1316. Conversely, the federal court should proceed to the merits of the constitutional question where the statute resists confinement within constitutional bounds, except through "extensive adjudications, under the impact of a variety of factual situations." *Id.* at 378, 84 S.Ct. 1316. In short, opacity of a state statute notwithstanding, abstention is only appropriate where a "single adjudication by a state court could eliminate the constitutional difficulty." *Procunier v. Martinez*, 416 U.S. 396, 401 n. 5, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

### B.

Given the shared goals of *Pullman* abstention and of the device of certification, the factors counseling the former are also suggestive of when the latter is desirable. As a result, *Arizonans, Quill,* and *Glucksberg* in no way lessen the significance of these *Pullman* factors. They do, however, put a gloss on them, while also pointing to other factors that are relevant to the question of certification.

Thus, the Supreme Court in *Arizonans* emphasized the relationship of certification to the canon of statutory construction under which statutes are to be read to avoid constitutional difficulties. *See Arizonans*, 520 U.S. at 78, 117 S.Ct. 1055. When a *state* statute is at issue, the Court pointed out, those difficulties are not comfortably avoided by a *federal* court interpretation. The task, instead, properly belongs to a state court, which must decide which canons of construction it can and should apply. *Cf. id.* at 78–79, 117 S.Ct. 1055.[10] The federal court should certify, and not interpret, because it "risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Id.* at 79, 117 S.Ct. 1055. The object, the avoidance of unnecessary, and hence premature, constitutional decisions, remains the same whether a state or federal statute is involved. *See generally* Alexander M. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* (1962). But, because a state law is at play, only the state court can ultimately determine whether a saving interpretation is appropriate under the canons of interpretation of the particular state whose statutes it is called upon to construe.

This teaching of the Supreme Court is fundamental and may result in some state courts having *more* and others *less* power than do federal courts to interpret state

---

10. In fact, as the Supreme Court noted, Arizona has adopted the federal canon under which statutes are to be interpreted to avoid constitutional difficulties. *See id.*

statutes to avoid constitutional difficulties. Because they are supreme in their power, under state law, to decide the meaning of state statutes, state courts are neither bound to follow, nor limited by, federal canons of interpretation, including those that speak to avoiding constitutional issues. It follows that a state court, under state canons, may be unwilling to do to a state statute what federal courts are expected to do to a federal one, *see, e.g., Califano v. Yamasaki*, 442 U.S. 682, 692–93, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (in a suit involving payments under the federal Social Security Act, the Supreme Court noted that federal courts "presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question" in order to avoid "unnecessary constitutional adjudication"). But it is also possible that state law would allow state courts to re-write state statutes to a degree that would be impermissible for federal courts dealing with federal laws. *Compare, e.g., Reno v. American Civil Liberties Union*, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (emphasizing, in a First Amendment challenge to the federal Communications Decency Act, that federal courts "may impose a limiting construction on a [federal] statute *only if* it is 'readily susceptible' to such a construction" (emphasis added)), *with National Ass'n of Indep. Insurers v. State*, 89 N.Y.2d 950, 952, 655 N.Y.S.2d 853, 678 N.E.2d 465, 466 (1997) ("A presumption of constitutionality attaches to [a New York law], and [New York courts are] *required* 'to avoid interpreting [it] in a way that would render it unconstitutional if such a construction can be avoided.'" (quoting *Alliance of Am. Insurers v. Chu*, 77 N.Y.2d 573, 585, 569 N.Y.S.2d 364, 571 N.E.2d 672 (1991)) (emphasis added)); *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 111 (Ind.1996) (Dickson, *J.*, concurring) (noting that Indiana courts have an *"overriding obligation* to construe [their] statutes in such a way as to render

them constitutional if reasonably possible" (emphasis added)).

This question of the extent to which the state court can go when interpreting its own laws is paradigmatically one of state law, and it is one that federal courts are singularly unsuited to answer. *Compare Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court, which is another way of saying that Alabama law is what the Alabama Supreme Court says it is. . . . At the threshold, the answer to [the question before this court] depends upon reconciliation of the competing trajectories of a number of canons of statutory construction. Given the nature of the overlapping and somewhat contradictory canons of statutory construction arguably applicable to this case, and the competing interests and policies at stake, the task is less like applying a scientific formula and more like painting a picture. We . . . are not at all confident our painting would resemble the one that Alabama Supreme Court would have produced."), *with Hope Clinic v. Ryan*, 195 F.3d 857, 865–69 (7th Cir.1999) (en banc) (Easterbrook, *J.*) (applying federal models of statutory construction in order to limit the enforcement of two state statutes banning partial-birth abortions to their "central core of meaning," such that the statutes could be enforced to prohibit only the abortion procedure known as dilation and extraction, even though the statutes themselves did not refer to this procedure), *petitions for cert. filed*, 68 USLW 3461 (Jan. 10, 2000), 68 USLW 3480 (Jan. 14, 2000). For that reason, too, certification—if otherwise appropriate—is particularly germane.

At the same time, *Arizonans* does not mean that a federal court must certify whenever (1) it has grave doubts about a state statute that has not yet been authoritatively interpreted by the state's highest tribunal and (2) those doubts could conceivably be avoided by an interpretation from a state court. The limits placed on

*Pullman* by *Baggett* and *Procunier* remain crucially relevant. And the Court's decision, after *Arizonans,* on the merits of the constitutional issues in the right-to-die cases, *see Glucksberg,* 521 U.S. at 706, 117 S.Ct. 2258; *Quill,* 521 U.S. at 797, 117 S.Ct. 2293, must mean that in some circumstances—even when a state statute raises serious constitutional questions that could be avoided by a state court interpretation and even when the *Pullman* factors do not counsel against certification—certification may not be warranted.

### C.

The difference in approach between *Arizonans* and the right-to-die decisions seems to turn on the concern that animates both certification and *Pullman* abstention to begin with—federalism. The Supreme Court found certification advisable in *Arizonans* in part because of "its potential importance to the conduct of Arizona's business." *Arizonans,* 520 U.S. at 78, 117 S.Ct. 1055. At issue in that case was the very manner in which Arizona was to carry out the basic functions of state governance: the challenged provision of the state constitution declared English the official state language and applied to, *inter alia,* "all government officials and employees during the performance of government business." Ariz. Const. art. XXVIII, § 1(3)(a)(iv). The parties' dispute over the proper interpretation of the amendment turned on the question of whether "the delivery of government services" was to occur only in English. *Arizonans,* 520 U.S. at 52, 117 S.Ct. 1055 (quoting Ariz. Attorney General Op. No. I89–009) (internal quotation marks omitted).

There is, of course, potential for "friction-generating error" between the federal and state court systems—the danger against which certification is intended to protect—in every case in which a "federal court is asked to invalidate a State's law." *Id.* at 79, 117 S.Ct. 1055. But the potential for friction is uniquely heightened—and certification is therefore particularly fa-

vored—when the litigation involves distinct federalism concerns, such as the possible incursion of federal courts into matters at the heart of state sovereignty. *Cf. Printz v. United States,* 521 U.S. 898, 918–919, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding unconstitutional the requirement in the Brady Bill that local law enforcement officers conduct background checks of prospective gun purchasers, because the federal government may not commandeer the apparati of state and local governments); *New York v. United States,* 505 U.S. 144, 177, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding that a federal enactment that "infring[es] upon the core of state sovereignty reserved by the Tenth Amendment ... is inconsistent with the federal structure of our Government established by the Constitution"). Such an unacceptable intrusion into quintessentially state matters is clearly what the Supreme Court believed to be the effect of the Ninth Circuit's holding in *Arizonans.*

*Glucksberg* and *Quill,* by contrast, did not center on core functions of state governments. They surely dealt with fundamental questions, but these were issues whose resolution would not affect the capacity of the relevant states to carry on their functions as sovereigns in other matters. Whether the distinction between aiding a person in the commission of suicide and helping that person to withdraw life-sustaining medical treatment is a constitutionally sound one is, without doubt, a question of enormous importance. Yet it is hard to deny that the ultimate capacity of the relevant states to govern in their proper spheres was less affected by the outcome of these cases than by holdings like the Ninth Circuit's in *Arizonans.*

As a result, though the history of the laws against suicide and assisted suicide in New York indicate that clarification from the New York Court of Appeals could have mooted the constitutional question, neither the Second Circuit nor the Supreme Court thought deferral to the state court on the question of statutory interpretation was

appropriate. Instead, both courts proceeded diligently to interpret the statute and squarely to confront the constitutional question. It follows that the federalism concern that was present in *Arizonans,* and that in part justified certification there, had to be more than a state's generic interest in enforcement of its laws—an interest clearly also at stake in *Glucksberg* and *Quill.* To justify deferral, the federalism concern had to affect—as it did in *Arizonans*—the very manner in which the state chose to operate as a government.

The border between cases like *Arizonans,* which entail core governmental functions, and cases like *Glucksberg* and *Quill,* which involve primarily the state's interest in upholding its laws and values, both in the face of claimed individual constitutional rights to the contrary, is by no means clear. And a large number of cases, no doubt, find their place in the DMZ in between. But that means only that the determination of whether to defer to the state court must "be made on a case-by-case basis."[11] *Baggett,* 377 U.S. at 375, 84 S.Ct. 1316.

### D.

In the course of this individualized inquiry—which gives priority to avoidance of unnecessary constitutional decisions and to respect for state sovereignty—the federal courts cannot, however, lose sight of the fact that possible constitutional rights are, by hypothesis, at risk. Accordingly, deferral to the state court is appropriate only where the claimed right can be sufficiently safeguarded during the pendency of state proceedings. It is for this reason that the *Pullman* cases look to the effect, on the constitutional right asserted, of the delay entailed by abstention. *See, e.g., Harman v. Forssenius,* 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (finding that the district court did not abuse its discretion in declining to abstain in a federal voting rights suit challenging Virginia's limitations on the franchise "[g]iven the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals"); *Bad Frog Brewery, Inc. v. New York State Liquor Auth.,* 134 F.3d 87, 94 (2d Cir.1998) (declining to abstain in a suit raising a First Amendment challenge to New York's regulation of liquor advertising and labeling in part because "[a]bstention would risk substantial delay while [the plaintiff] litigated its state law issues in the state courts"). Rights delayed, after all, are often rights destroyed. And it is therefore not surprising that *Pullman* abstention has been used only very sparingly. *See Midkiff,* 467 U.S. at 236, 104 S.Ct. 2321 ("[A]bstention [under *Pullman*] from the exercise of federal jurisdiction is the exception, not the rule." (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)) (internal quotation marks omitted)); *Public Serv. Co. v. Patch,* 167 F.3d 15, 24 (1st Cir.1998) (declining to abstain where the timing of proceedings in state court was uncertain and plaintiff faced an immediate threat to its asserted rights); *Bad Frog Brewery,* 134 F.3d at 94 (declining to abstain in order to safeguard asserted First Amendment rights).

Likewise, when *certification* is the proposed remedy, timing remains an important factor. *See LTV Steel Co. v. Northwest Eng'g & Constr., Inc.,* 41 F.3d 332,

---

11. Whether this distinction—between a state's interest in enforcing its laws and values and its interest in protecting its sovereign integrity—is one that ultimately *should* bear constitutional significance is not for us to decide. The Supreme Court has made clear that our federalist system of dual sovereigns countenances federal incursions on the former but not the latter. *Compare McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (holding unconstitutional Ohio state law banning distribution of anonymous campaign literature), *with Printz,* 521 U.S. at 933, 117 S.Ct. 2365 (holding unconstitutional a portion of a federal law requiring local governments to aid in its administration).

338 (7th Cir.1994) (declining to certify in diversity case where the federal court found "sufficient guidance in the decisions of the Indiana Court of Appeals to decide this case without subjecting the parties to the additional delay and expense inherent in certifying a question to the Indiana Supreme Court"); *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 275 (5th Cir.1976) (declining to certify the question of whether the Florida Attorney General was authorized under state law to bring an antitrust action against defendant oil companies based in part on the "practical limitations of the certification process [such as] significant delay").

At the same time, the danger of delay inherent in certification is to some extent offset by the efficiency of the procedure—and the delay created by certification is almost never as great as that imposed by abstention. *See Arizonans*, 520 U.S. at 76, 117 S.Ct. 1055 ("Certification procedure, in contrast [to *Pullman* abstention] ... reduc[es] the delay, cut[s] the cost, and increas[es] the assurance of gaining an authoritative response."); *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 396, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) ("Certification, in contrast to the more cumbersome and (in this context) problematic abstention doctrine, is a method by which we may expeditiously obtain [an authoritative] construction."); *Bellotti v. Baird*, 428 U.S. 132, 151, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) ("The importance of speed in resolution of the instant litigation is manifest. Each day the statute is in effect, irretrievable events, with substantial personal consequences, occur. Although we do not mean to intimate that abstention would be improper in this case were certification not possible, the availability of certification greatly simplifies the analysis."); *Lehman Brothers v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (noting that certification "in the long run save[s] time, energy, and resources and helps build a cooperative judicial federalism"). Of course, this does not mean that the relative efficiency of certification will in every case suffice to insulate the asserted right from the harm of delay. But it does underscore the salience of timing to the question of whether to certify.

Timing, however, is not the only consideration. The underlying issue cannot, after all, be timing in itself, but whether, while the state court is parsing the statute, the asserted right can be adequately safeguarded without unduly harming the interests sought to be furthered by the state law. As a result, in addition to looking to the length of the delay, courts should also consider whether, pending certification, they can protect the claimed right, perhaps through a stay, without thereby too grievously undermining the state concerns at stake. *See, e.g., American Booksellers Ass'n*, 484 U.S. at 397, 108 S.Ct. 636 (staying the enforcement of the challenged state statute during certification to permit the state's highest tribunal to interpret its own statute, and in that way possibly save it from constitutional infirmity). By issuing a stay, a court can sometimes, so to speak, have its comity cake and eat it, too.

Often, however, no such protective procedural device exists. If, for example, a plaintiff successfully obtains a preliminary injunction in federal court permitting her to hold a parade that the local government contends violates a state statute, the federal appellate court would be likely to stay the injunction pending appeal. If the appellate court then decided to certify, there would be no way to protect the asserted rights during certification. For, were the appellate court to lift the stay so that the plaintiff could hold her parade, the issue certified to the state court would forthwith be rendered moot. In such a case, the choice presented to the federal court would be regrettably stark, since certification, or rather the delay it causes, would necessarily pose a risk to the claimed right.

On the other hand, there are many situations in which certification is entirely compatible with the protection of asserted

constitutional rights. When, for example, the plaintiff seeks permanently to enjoin the enforcement of an allegedly unconstitutional state statute, a federal court can issue a right-protecting stay during the pendency of the certification without rendering the certified issue moot. This very approach might have been feasible in a recent case that has deeply divided the Seventh Circuit. *See Hope Clinic,* 195 F.3d at 869 (upholding the constitutionality of state statutes banning partial-birth abortion, to the extent the statutes prohibited only the abortion procedure known as dilation and extraction).

In *Hope Clinic,* Judge Easterbrook, writing for a majority of the *en banc* court, grappled with a vagueness challenge to a Wisconsin and an Illinois state statute, each of which prohibited "partial-birth abortion." *Id.* at 863. The statutory definitions, however, were, as Judge Easterbrook stated, "an imperfect match for the medical definition of" dilation and extraction ("D&X"), *id.,* the relatively rare abortion procedure which "[b]oth medical and popular literature [call] 'partial-birth abortion,'" *id.* at 865. That is, the statutes could also be read to prohibit more common abortion procedures, such as dilation and evacuation ("D&E") and induction. Under such a reading, the court unanimously acknowledged, the laws would unduly burden a woman's right to abortion and would therefore be unconstitutional. *See id.* at 863–64. Nonetheless, the court upheld the state statutes because it believed it "possible, . . . we think[,] that the Supreme Courts of Illinois and Wisconsin could read their laws in ways that comport with the Constitution." *Id.* at 865.

Basing its decision entirely on federal canons of construction and canons of states other than Illinois and Wisconsin, the Seventh Circuit proceeded to outline three different methods by which the state courts could potentially interpret the statutes not to prohibit D&E or induction. *See id.* at 865–68. The court then remanded the cases to the respective district

courts to "enter precautionary injunctions, limited to implementing the conclusion . . . that the state laws may not be applied to a normal D&E or induction until after the state has provided additional specificity, by statutory amendment, regulations, or judicial interpretation." *Id.* at 869. The stated purpose of the precautionary injunctions was to "preserve[ ] the state judiciary's role while protecting plaintiffs' (and their patients') legitimate interests in the interim." *Id.* at 870.

But, as Chief Judge Posner noted in dissent, the injunctions effectively ensured that the state courts of Illinois and Wisconsin would "never have an opportunity to explore the outer bounds of these statutes" because, by their very terms, the injunctions limited enforcement of the statutes to their "core prohibition." *Id.* at 877 (Posner, *C.J.,* dissenting). Under these circumstances, and given that both majority and dissent agreed that the statutes, as written, were unconstitutional, *see Hope Clinic,* 195 F.3d at 863–64; *id.* at 886 (Posner, *C.J.,* dissenting), certification might well have been the prudent course. *Cf. Karlin v. Foust,* 188 F.3d 446, 497 (7th Cir.1999) (Cudahy, *J.,* concurring in part and dissenting in part) (noting that in a case involving a different provision of Wisconsin's partial-birth abortion statute, Judge Cudahy "would [have] certif[ied] to the Wisconsin Supreme Court the issue whether as a matter of state law scienter would be required for the imposition of civil forfeiture liability under the Act" because "[i]f state law were [so] construed . . ., a serious constitutional issue would be avoided").

Thus, in a context like the one before the Seventh Circuit in *Hope Clinic,* where the issue would not have been mooted by a *stay of the enforcement of the challenged* state statutes during a hypothetical certification to the Wisconsin and Illinois Supreme Courts, and where the statutes as written were concededly constitutionally suspect, a stay might well have been an appropriate method of protecting asserted

rights in the interim. *Cf. Hope Clinic v. Ryan,* 197 F.3d 876, 878–79 (7th Cir.1999) (Diane P. Wood, *J.,* dissenting from the vote of an equally divided court to deny stays of the mandate of the en banc court pending petitions for certiorari) ("In my view, the only responsible action this court can take from the standpoint of its national responsibility and role is to stay the mandates [which permit enforcement of the partial-birth abortion statutes in Wisconsin and Illinois against the abortion procedure known as dilation and extraction] pending the Supreme Court's disposition of the petitions for certiorari.").

This discussion is not intended to express any view on the substance of the Seventh Circuit's decision. Nevertheless, it illustrates (1) that the delay created by certification may, in itself, on occasion unacceptably harm the claimed right, (2) that certification, despite its inevitable delay, can sometimes be deployed in a manner that fully protects the asserted constitutional rights, and (3) that the determination of whether (a) the right is indeed adequately protected and (b) the state's interest in enforcement is not unduly harmed by the stay can only be decided on a case-by-case basis.

### E.

The composite lesson of all these cases is that there are at least six factors that must be considered in deciding whether certification is justified. They are (1) the absence of authoritative state court interpretations of the state statute, (2) the importance of the issue to the state and the likelihood that the question will recur, (3) the presence of serious constitutional difficulties that could be avoided by a possible interpretation of the statute, (4) the capacity of certification to resolve the litigation and either to render federal constitutional decisions unnecessary or to ensure that they are inescapably before the federal court, (5) the federalism implications of a decision by the federal courts and in particular whether a decision by the federal judiciary potentially interferes with core matters of state sovereignty, and (6) the effect of the delay entailed by certification on the asserted rights at issue.

### V.

### A.

I reach at last the question of whether certification is appropriate in this case. As discussed above, there is no decision from the New York Court of Appeals interpreting the exemption under § 245.01 and § 245.02, and decisions of lower New York courts take arguably conflicting positions on whether nude photography is prohibited. Accordingly, the first factor, the absence of authoritative, on-point state court decisions, leans strongly in favor of certification. Similarly, there can be no doubt that New York's status as a home to much artistic life renders the issue in this case both significant and likely to recur. Thus, the second factor also weighs in certification's favor.

I turn next to the more meaty question of whether this case presents serious constitutional difficulties that could be avoided by a possible statutory interpretation. Were New York's ban on public nudity interpreted to criminalize Tunick's proposed photo shoot—either because, as the City argues, the statutory exemption applies only to indoor performances with an audience, or because the photo shoot, for some other reason, falls outside the exemption—then this court would be required to address plaintiff's argument that the First Amendment does not permit "so broad an application of the Penal Law" to "serious artistic expression." Appellee's Brief at 30.

I conclude that the constitutional question raised, if the law is interpreted to prohibit Tunick's photo shoot, would be a grave one for at least two reasons. The first concerns the tortured issue of the level of protection that is constitutionally afforded to artistic or expressive nudity. *Compare Barnes v. Glen Theatre, Inc.,* 501

U.S. 560, 566–67, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion) (Rehnquist, *C.J.*, joined by O'Connor and Kennedy, *JJ.*) (requiring a state statute banning public nudity, as applied to erotic nude dancing, to serve an important or substantial governmental interest in order to be constitutional), *with id.* at 593, 111 S.Ct. 2456 (White, *J.*, dissenting) (noting that he would require the same statute to serve a compelling governmental interest). The second focuses on the possible irrationality of a distinction (a) between nude photo shoots and other nude exhibitions, and (b) between indoor and outdoor nude performances.

As a threshold matter, Tunick's artistic activity is entitled to some First Amendment protection. *See Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (the "painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll" is "unquestionably shielded"). And the fact that his photography involves nude bodies does not remove it from the Amendment's scope. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("[N]ude dancing is not without its First Amendment protections from official regulation."). While there may be classroom hypotheticals that explore the hazy line between nude photography as unprotected conduct and nude photography as artistic expression, this is not such a case.

The City makes no contention that the photography at issue is obscene and therefore unprotected by the First Amendment, *see Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), or even lascivious in the manner, say, of erotic dancing, *see Barnes*, 501 U.S. at 566, 111 S.Ct. 2456 (plurality opinion) (Rehnquist, *C.J.*) (erotic nude dancing is "expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"). And the City does not dispute plaintiff's contention that he is an internationally recognized photographer who seeks to further his artistic vision through the proposed photo shoot. Accordingly, the question in this case is whether the state ban on public nudity impermissibly infringes on Tunick's constitutional right to engage in artistic, expressive activity.

In *Barnes*, a fractured Supreme Court found that Indiana's public indecency statute could constitutionally be applied to prohibit erotic nude dancing. *See Barnes*, 501 U.S. at 563, 111 S.Ct. 2456. Five justices voted to uphold the state law, but no opinion commanded a majority. Four justices dissented. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

Chief Justice Rehnquist announced the judgment of the Court in *Barnes* in an opinion joined by Justices O'Connor and Kennedy. His plurality opinion analyzed the Indiana statute under the four-part test of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), applicable to incidental limitations on expressive activity. *See Barnes*, 501 U.S. at 567, 111 S.Ct. 2456. Under *O'Brien*, a government regulation that burdens communicative conduct "is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. Chief Justice Rehnquist concluded that Indiana's "public indecency statute

furthers a substantial government interest in protecting order and morality." *Barnes*, 501 U.S. at 569, 111 S.Ct. 2456.

Justice Souter, writing for himself, concurred in the judgment of the Court. *See id.* at 581–87, 111 S.Ct. 2456 (Souter, *J.*, concurring). He agreed with the plurality that *O'Brien* controlled, but rejected the notion that "society's moral views" could serve as a substantial government interest. *Id.* at 582, 111 S.Ct. 2456. He nevertheless found the Indiana law justified by the state's important "interest in combating the secondary effects [such as prostitution and other criminal activity] of adult entertainment establishments of the sort typified by respondents' establishments." *Id.* Justice Souter, moreover, explicitly called into question the statute's permissibility, if it were to be applied to expressive activity not associated with pernicious secondary effects: "[T]he secondary effects rationale on which I rely here would be open to question if the State were to seek to enforce the statute by barring expressive nudity in classes of productions that could not readily be analogized to the adult films at issue in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)."[12] *Id.* at 585 n. 2, 111 S.Ct. 2456.[13]

I conclude, as have five circuits, that Justice Souter's opinion was the most narrow of the opinions upholding the statute. *See DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 830 (7th Cir.1999); *J & B Entertainment, Inc. v. City of Jackson*, 152 F.3d 362, 370 (5th Cir.1998); *Farkas v. Miller*, 151 F.3d 900, 904 (8th Cir.1998); *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 134 (6th Cir.1994); *International Eateries of Am., Inc. v. Broward County*, 941 F.2d 1157, 1160–61 (11th Cir.1991).[14] And there is no question that under Justice Souter's rationale, the New York statute, if applied to Tunick's photo shoot, would be constitutionally suspect. For, as Justice Souter noted:

> [it] is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than in an "adult" theater, would further the State's interest in avoiding harmful secondary effects, in the absence of evidence that expressive nudity outside the context of *Renton*-type adult entertainment was correlated with such secondary effects.

*Barnes*, 501 U.S. at 585 n. 2, 111 S.Ct. 2456 (Souter, *J.*, concurring). And the City has made no effort to suggest any deleterious secondary effects of the sort listed by Justice Souter that might attend Tunick's photo session.[15]

---

12. In *Renton*, the Supreme Court upheld a city's zoning ordinance targeting adult entertainment establishments as a content neutral regulation of speech. *See Renton*, 475 U.S. at 48, 106 S.Ct. 925. The Court ruled that the City of Renton had a substantial interest in preventing the harmful "secondary effects" associated with such businesses. *Id.* at 50, 106 S.Ct. 925.

13. The third opinion constituting the fifth vote in favor of upholding Indiana's statute was written by Justice Scalia. Unlike his eight colleagues on the Court, he found the case simply undeserving of any First Amendment scrutiny, reasoning that the prohibition against public nudity was "a general law regulating conduct and not specifically directed at expression." *Id.* at 572, 111 S.Ct. 2456 (Scalia, *J.*, concurring).

14. The Supreme Court granted certiorari to consider a case from the Pennsylvania Supreme Court which held a city's public indecency ordinance, as applied to nude erotic dancing, unconstitutional under the federal First Amendment. *See Pap's A.M. v. City of Erie*, 719 A.2d 273, 553 Pa. 348 (1998), *cert. granted*, — U.S. ——, 119 S.Ct. 1753, 143 L.Ed.2d 786 (1999). The Court heard oral argument in the case on November 10, 1999. Joan Biskupic, *High Court Hears Privacy Issue*, Wash. Post, Nov. 11, 1999, at A18.

15. Indeed, serious constitutional questions would also be present under Chief Justice Rehnquist's plurality rationale. In *Barnes*, as the Chief Justice emphasized, Indiana had prohibited *all* public nudity. *See Barnes*, 501 U.S. at 568, 111 S.Ct. 2456. It was because public nakedness as such sufficed to offend Indianans' morality, the Chief Justice wrote,

The fact, moreover, that the City argues for an interpretation that would single out and ban photo shoots, however artistic and whether indoor or outdoors, but would authorize other types of nude performances, at least indoors, regardless of how erotic and/or lacking in artistic content, gives rise to a second serious constitutional doubt, based on rationality. The City gives no reasons for the distinction it asserts, other than saying that this is what the plain language of the statute entails. But, assuming that were so, grave questions would then arise as to the rationality of a law that singled out for prohibition one form of nude expression that is concededly covered by the First Amendment, while permitting, with mighty little explanation, many other equally nude demonstrations.

One need not contemplate why, on the City's reasoning, a totally naked production of *Hamlet* could be staged in the middle of Grand Central Station during rush hour, while Tunick's photo shoot had to be banned regardless of the time, place, or manner in which it occurred, to say that the statute as interpreted by the City would raise serious constitutional issues. It is enough to ask why a nude performance with an audience would be permitted, and a photo shoot in the same place would be prohibited, to suggest that significant constitutional problems, based on irrationality, attend the City's reading of the statute.

Nor is a construction of the statute that would avoid all constitutional problems implausible. Thus, the statute's exemption

for "exhibitions" could be read to cover the abstract arrangement of 75 to 100 nude models draped across a public street. An exhibition is, after all, "a public ... showing ... esp[ecially] of works of art." *Webster's Third New International Dictionary* 796 (1993). Moreover, the language of the statute, by its own terms, nowhere distinguishes between indoor and outdoor performances. Finally, and as importantly, the New York Court of Appeals, in one of the few cases that it has heard under the statute, has demonstrated that it has considerable authority to interpret the statute narrowly to avoid constitutional questions. *See Santorelli*, 80 N.Y.2d at 876-77, 587 N.Y.S.2d 601, 600 N.E.2d 232 (employing the canon of New York statutory construction under which state courts "must construe a statute ... to uphold its constitutionality if a rational basis can be found to do so" and, as a result, interpreting § 245.01, which on its face prohibits women but not men from publicly exposing their nipples, not to apply to women who bared their breasts in a public park); *cf. Arizonans*, 520 U.S. at 78-79, 117 S.Ct. 1055 (indicating that use by state courts of state canons of statutory construction, to avoid constitutional questions, is relevant to the desirability of certification).

It follows that the third factor, allowing the state tribunal to make what, under the applicable state canons, is a plausible interpretation to avoid serious constitutional issues, weighs heavily in favor of certification.

---

that nude dancing could be barred. *See id.* But New York—by its statute—expressly permits some nudity. As a result, Tunick's photographs do not on their face contravene the public morality of the state of New York. It follows that a more specific violation of public morality must be found if Tunick's photo shoot is to be left unprotected by the *Barnes* plurality opinion. This particularized violation might be present were the photographs to be taken in particular times, places, or manners. But the City has explicitly declined to make any such attack on the shoot.

There is no need, of course, to speculate about how particular Justices might ultimate-

ly vote if the instant case were before them. All that is needed to justify certification with respect to this factor is that the statute, if not narrowly interpreted, would raise serious constitutional issues. Since, under the reasoning of the dissent, which would have applied strict scrutiny to the Indiana ordinance, *see id.* at 595, 111 S.Ct. 2456 (White, *J.*, dissenting), the City's interpretation of the New York statute would obviously raise grave constitutional questions, I conclude that serious constitutional issues would exist on the reasoning of eight of nine *Barnes* justices.

## B.

Like those that precede it, the fourth factor, the capacity of certification either to resolve the litigation or to frame the constitutional question, strongly supports certification. The City has conceded that the district court's injunction properly issued unless the state statute validly prohibits Tunick's photo shoot. Hence, certification will, on one reading of the statute, totally resolve the case and avoid all constitutional problems. On another, either it will also resolve the case—were the state court to find the state law invalid under the state constitution—or it will present, as clearly and directly as can be, a federal constitutional issue that is then ready for federal adjudication. "Under these unusual circumstances where it appears the State will decline to defend a statute if it is read one way and where the nature and substance of plaintiff's constitutional challenge is drastically altered if the statute is read another way, it is essential that we have the benefit of the law's authoritative construction from the [state's highest court]." *American Booksellers*, 484 U.S. at 395, 108 S.Ct. 636 (certifying the interpretation of a Virginia law that criminalized the display of sexual or sadomasochistic materials that were harmful to juveniles, even though certification delayed the adjudication of the asserted First Amendment rights).

## C.

The last two considerations, whether this case implicates a distinct federalism concern and whether the delay of certification would unduly harm the right asserted, are not as clear cut. This case stems from the claimed First Amendment rights of a photographer to implement his artistic vision. His individual rights, as against those of the state to enforce its laws and values, are undoubtedly at issue. But this litigation also raises distinct federalism concerns.

We would be ostriches if we failed to take judicial notice of the heavy stream of First Amendment litigation generated by New York City in recent years. Notable cases in which this court or a district court has preliminarily enjoined or found unconstitutional on First Amendment grounds some action or policy of the City include *Latino Officers Ass'n v. City of New York*, 196 F.3d 458 (2d Cir.1999) (affirming a preliminary injunction that enjoined the City from prohibiting plaintiffs from participating, in their uniforms and behind their organizational banner, in various parades held in 1999); *Million Youth March, Inc. v. Safir*, 155 F.3d 124 (2d Cir.1998) (affirming and modifying a preliminary injunction requiring the City to issue a parade permit to an organization seeking to hold a public event in 1998); *Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998) (finding unconstitutional the City's policy of requiring City employees to obtain permission before speaking to the media); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123 (2d Cir.) (finding unconstitutional the municipality's refusal to display advertisements arguably critical of the mayor), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998); *Bery v. City of New York*, 97 F.3d 689 (2d Cir.1996) (finding unconstitutional the City's limitation on licenses for sidewalk artists), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *Housing Works, Inc. v. City of New York*, 72 F.Supp.2d 402 (S.D.N.Y.1999) (issuing a preliminary injunction requiring the City to re-rank plaintiff, a non-profit agency, on a priority list for federal funding based on a clear and substantial likelihood that the City had downgraded plaintiff on the list in retaliation for its protected speech, including, *inter alia*, criticism of the mayor's administration and various successful First Amendment lawsuits against the City), *appeal dismissed as moot*, 203 F.3d 176 (2d Cir.2000); *East Timor Action Network v. City of New York*, 71 F.Supp.2d 334 (S.D.N.Y.1999) (issuing a declaratory judgment that the City's denial of plaintiff's application to erect temporary street signs

violated the First Amendment); *Brooklyn Inst. of Arts & Sciences v. City of New York*, 64 F.Supp.2d 184 (E.D.N.Y.1999) (preliminarily enjoining the City from withholding funding from and filing suit for ejectment against the Brooklyn Museum based on the content of a temporary exhibit at the museum); *Million Youth March, Inc. v. Safir*, 63 F.Supp.2d 381 (S.D.N.Y.1999) (issuing a preliminary injunction requiring the City to grant a parade permit to an organization seeking to hold a public event in 1999); *Gasparo v. City of New York*, 16 F.Supp.2d 198 (E.D.N.Y.1998) (preliminarily enjoining the City's concession scheme for newsstands in light of the likelihood that the City's unlimited authority to terminate concessions would chill protected speech); *Latino Officers Ass'n v. City of New York*, 966 F.Supp. 238 (S.D.N.Y.1997) (preliminarily enjoining the City from prohibiting plaintiffs from participating, in their uniforms and behind their organizational banner, in parades held in June 1997); *Time Warner Cable v. City of New York*, 943 F.Supp. 1357 (S.D.N.Y.1996) (preliminarily enjoining as unconstitutional the City's decision to place commercial television programs on cable channels reserved for educational or governmental purposes), *aff'd on other grounds sub nom., Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997); *Housing Works, Inc. v. Safir*, 1998 WL 823614 (S.D.N.Y. Nov.25, 1998) (preliminarily enjoining the City from prohibiting non-profit AIDS organization from conducting a press conference in front of City Hall in view of the likelihood that the City policy was content-based), *stay granted in part*, 1998 WL 824534 (2d Cir. Nov.30, 1998) (order issuing partial stay later withdrawn); *Housing Works, Inc. v. Safir*, 1998 WL 409701 (S.D.N.Y. July 21, 1998) (preliminarily enjoining City from enforcing its policy of limiting press conferences in front of City Hall to groups of 25 or fewer); *United Yellow Cab Drivers Ass'n v. Safir*, 1998 WL 274295 (S.D.N.Y. May 27, 1998) (finding unconstitutional the City's refusal to permit more than 20 taxi drivers to participate in a protest against proposed rules for pick-up and drop-off), *aff'd as modified*, No. 98–7737 (2d Cir. May 27, 1998) (unpublished disposition); *Latino Officers Ass'n v. City of New York*, 1997 WL 473972 (S.D.N.Y. Aug.19, 1997) (enjoining the City from prohibiting plaintiffs from participating, in their uniforms and behind their organizational banner, in parades held in the late summer and fall of 1997), *appeal dismissed as moot*, 152 F.3d 919 (2d Cir.1998) (unpublished disposition); *cf. MacDonald v. Safir*, 206 F.3d 183 (2d Cir.2000) (vacating and remanding the district court's grant of summary judgment for the City on plaintiff's claim that the City ordinance governing the issuance of parade permits violates the First Amendment).[16] Some of the parties' names reappear on this list. This is apparently the result of the City engaging in acts similar to those previously enjoined by the federal courts.

As a result of this relentless onslaught of First Amendment litigation, the federal courts have, to a considerable extent, been drafted into the role of local licensors for the City of New York. When the Ninth Circuit in *Arizonans* found Arizona's English-only amendment unconstitutional, it effectively assumed the role of state planning bureau, telling Arizona how it was to deliver services to the public. And that fact seemed to influence the Supreme Court, which, after finding the case before it moot, decided to vacate the Ninth Circuit holding on the ground that certification should have been sought. *See supra* note 8 and accompanying text. Similarly, a decision on the constitutional question in this case would result in this court acting, to some extent, as the City's permitting agency, determining for it who may speak, or parade, or photograph.

**16.** This list excludes individual employment, retaliation, or malicious prosecution cases involving First Amendment rights.

All this is not to diminish the importance of our role in adjudicating and vindicating First Amendment and other constitutional rights. Nor does it alter the fact that, in most such cases, it would be wrong to see the federal courts as doing anything more than balancing those rights against the state's interest in enforcing its laws and values. But, in the current and rather remarkable state of affairs in New York City, there is an all too clear danger that the courts, instead of merely interpreting and defending federal rights, may cross the line and become, in effect, an agency that performs crucial local government functions. While this case would not by itself force us to transgress that boundary, it does—in context—raise federalism concerns that make certification more advisable than it might ordinarily be. Accordingly, this factor does not weigh against certification.

### D.

The foregoing five factors—whether there is a binding decision of the New York Court of Appeals on point, whether the issue is important and recurring, whether serious federal constitutional difficulties that exist can be avoided by a plausible interpretation of the state statute, whether certification will likely resolve the case or, if it does not, will focus the constitutional issue, and whether federal court adjudication of the issue raises distinct federalism concerns—taken together strongly counsel in favor of deferral to the state court.

There is, however, an additional issue that cannot be ignored. It is the effect of certification, and its attendant delay, on the constitutional right here asserted. This factor is fundamental and, in many contexts, it will outweigh the others and mandate speedy and direct action by the federal court. The case before us is a First Amendment one, in which the City appeals from the grant of a preliminary injunction ordering it to permit the expression it sought to ban. In seeking counsel

from the New York Court of Appeals, we inevitably and unfortunately delay the ultimate adjudication of this case, "a result quite costly where ... a state statute may inhibit the exercise of First Amendment freedoms." *Baggett*, 377 U.S. at 379, 84 S.Ct. 1316 (declining to abstain under *Pullman* in a vagueness challenge to a Washington statute requiring public employees to take loyalty oaths).

Violations of the First Amendment are, moreover, presumed to be irreparable. *See Elrod*, 427 U.S. at 373, 96 S.Ct. 2673; *Bery*, 97 F.3d at 694. The delay, therefore, inherent in certification, if it harms the First Amendment right that plaintiff sought to vindicate by seeking this preliminary injunction, does so irreparably. *Cf. Zwickler v. Koota*, 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (declining to abstain under the *Pullman* doctrine in a First Amendment facial challenge to a New York state law because "to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect"). Nor can this harm be much assuaged by the knowledge that "[f]ew public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies," *Pullman*, 312 U.S. at 500, 61 S.Ct. 643, or by the fact that, as the Supreme Court has repeatedly noted, the harm of delay is to some considerable extent mitigated by the efficiency of certification, *see, e.g., Arizonans*, 520 U.S. at 76, 117 S.Ct. 1055; *American Booksellers*, 484 U.S. at 396, 108 S.Ct. 636; *Bellotti*, 428 U.S. at 151, 96 S.Ct. 2857; *Lehman Brothers*, 416 U.S. at 391, 94 S.Ct. 1741. As a result, in appropriate cases, courts have concluded that the proper balance is to keep the right-preserving injunction in effect pending the result of certification. *See, e.g., American Booksellers*, 484 U.S. at 397, 108 S.Ct. 636 (enjoining the enforcement of a state statute potentially violative of First Amendment rights pend-

ing certification); *see also supra* at 79–81 (discussing *Hope Clinic*). But that procedure is not available to us in the instant case. *See supra* at 79. Were we to lift the stay on the preliminary injunction, and thereby to permit plaintiff to take his photograph, we would moot the issues certified to the New York Court of Appeals.

Under the circumstances, I believe that imposing on plaintiff the delay entailed by certification is the least harmful alternative. I reach this conclusion primarily because the plaintiff indicated both in his brief and at oral argument that he retains an ongoing interest in conducting the photo shoot, regardless of *when* the event actually occurs. Indeed, it is for this very reason that the case before us is not now moot. *See supra* note 3. In other words, while the harm is irreparable, time is not of the essence. Given that certification is strongly favored by all of the other relevant factors taken together, it is hard for me to justify declining to certify, in order to rule expeditiously on an alleged right that, by plaintiff's own assertion, can be satisfactorily vindicated at a later date.

The issue is a close one, however, and Judge Sack takes the eminently plausible view that, even in this case, the First Amendment rights at stake cannot adequately be protected pending certification and that this consideration outweighs the remaining factors otherwise counseling de-

ferral to the state court. *See infra* Concurr. Op. at 94–96. I reiterate that I agree with Judge Sack that in many First Amendment cases—particularly those involving prior restraints—the constitutional rights involved are significantly damaged, if not altogether lost, by the delay entailed in certification, and that in such cases certification, even if favored by all of the other factors, is not acceptable. But in the situation before us, I respectfully disagree with Judge Sack.[17]

Besides plaintiff's not-insignificant concession regarding the timing of his interest, there is, I believe, an additional reason for certifying in this case. Judge Sack suggests that, were we to affirm a modified injunction that prevents the City from interfering with the taking of the photographs but leaves it free to arrest Tunick after completion of the shoot, the meaning of the statute would ultimately be decided by the New York state courts in the ensuing criminal case. *See infra* Concurr. Op. at 94. But in fact, were we to take this route, there would be no guarantee that the City would actually press charges after arresting Tunick. Indeed, after every other one of Tunick's arrests for violations of the Penal Law, the case against him was ultimately dropped. The result of course is that there has not to date been, nor is

17. Judge Sack appears to take the position that an unclear state statute affecting expression can in itself unacceptably inhibit speech because it enables government officials charged with its enforcement to engage in standardless decisionmaking. In such circumstances, he believes that the federal court is compelled to find an unconstitutional prior restraint. *See infra* Concurr. Op. at 92–94. But in many such cases, an interpretation of the statute that could render the law sufficiently clear to eliminate the danger of unfettered discretion is in fact available. Where that is so, a finding of an unconstitutional prior restraint, perhaps needlessly and certainly prematurely, does damage to the interests animating the state statute. Judge Sack's approach not only does not heed the Supreme Court's stricture that federal courts, where possible, should dispose of cases by deciding state statutory questions "rather than ... unnecessarily" reaching federal constitutional

issues, *see Siler v. Louisville and Nashville R.R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909), it also fails to give adequate weight to the interests served by the state law.

In the circumstances of this case, I believe that the interpretation of New York Penal Law § 245.01 and § 245.02 should issue from the state court. If, however, as Judge Sack believes, certification were inappropriate because the delay it entails would unduly harm the federal right, the federal court should itself interpret the state law before deciding what remains a potentially avoidable federal constitutional question. *See id.* (The same would be true, of course, were the state court to decline certification.) For a recent discussion on the desirability of federal court adjudication of state (constitutional) law issues in facilitating, among other things, the avoidance of federal constitutional decisionmaking, see Robert A. Schapiro, *Polyphonic Federalism: State Constitutions in the Federal Courts*, 87 Cal. L.Rev. 1409 (1999).

there likely to be in the foreseeable future, any interpretation of the relevant state law by the only court that can do so definitively, the New York Court of Appeals.

This might not matter in many situations. But, in this case, it would mean that the threat of prohibiting Tunick or other photographers in the future from doing what Tunick seeks to do now would remain a Sword of Damocles over them. As a practical matter then, were we to take Judge Sack's approach, we might well end up with a more effective, and potentially much longer lasting, prior restraint than would result from a delay in the adjudication of Tunick's rights pending certification. And this is all quite apart from the obvious desirability of not deciding the constitutional question that Judge Sack would reach but that an opinion of New York's highest court might well render unnecessary.

In any event, because we retain jurisdiction over this case, *see infra* at 90, we have the option of reconsidering the stay that we earlier imposed on the preliminary injunction should certification impose unexpected delays or should conditions with respect to the asserted right change. This option allows us to continue, in the light of evolving circumstances, to balance the desirability of avoiding needless friction with state courts and of unnecessary constitutional decision making against the harm of extended delay in the adjudication of potential First Amendment rights. Given the circumstances of this case, where plaintiff seems to believe that his own rights can be satisfactorily exercised in the future, and where a decision not to certify may well leave plaintiff and those like him uncertain for an indefinite time as to whether outdoor photographs involving nudity may lawfully be taken, I believe that the effect of a temporary delay in the

adjudication of the rights at issue does not outweigh the factors favoring certification.

## HOLDING

A majority of this panel is not at this time—albeit for different reasons—prepared to rule on the underlying federal constitutional issue. A majority of this panel is, however, and again for different reasons, of the view that under the circumstances certification is appropriate. Accordingly, we certify. But we do so without prejudice to entertaining a motion to lift the stay of the district court's injunction should the delay entailed by certification lead to conditions that would justify immediate adjudication of the right asserted.

## CERTIFICATE

Certificate to the New York Court of Appeals pursuant to N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(b) (1999) and § 0.27 of the Local Rules of the United States Court of Appeals for the Second Circuit.

Title 22, § 500.17(a) of the New York Compilation of Codes, Rules & Regulations permits certification of "determinative questions of New York law ... for which there is no controlling precedent of the Court of Appeals." We believe that this appeal presents such a case.[18] The New York Court of Appeals has yet to interpret the scope or constitutionality of the exemption under Penal Law § 245.01 and § 245.02, and two lower state court decisions appear to take opposing views on whether nude photography falls within the statute's proscription. Moreover, the court that indicated that such photographs were barred by the statute thereupon held the law void under the New York constitution. Because the City rests its entire argument on the scope and validity of § 245.01 and § 245.02, a determination by

---

18. Although neither party has made a motion to certify the question to the Court of Appeals, our Local Rules specifically authorize us to certify *nostra sponte*. *See* Second Circuit Local Rule § 0.27.

the Court of Appeals that these sections do not prohibit Tunick's proposed photo shoot would entirely resolve this case. *See supra* Sections II and V.B., and note 17. Given the long history of the state, and in particular of the City, as a center for artistic activity, similar questions regarding the type of nudity proscribed by the statute are likely to recur. We therefore certify the following questions to the New York Court of Appeals:

(1) Whether a photographic shoot involving 75 to 100 nude bodies arranged in an abstract formation on a public street constitutes entertainment or performance in a "play, exhibition, show or entertainment" within the meaning of the exception to N.Y. Pen. Law § 245.01 and § 245.02.

(2) If the answer to the first question is yes, whether the exceptions to N.Y. Pen. Law § 245.01 and § 245.02 are limited to indoor activities.

(3) If the answer to the first question is no, or if the answers to the first and second questions are both yes, whether N.Y. Pen. Law § 245.01 and § 245.02, so interpreted, are valid under the Constitution of the State of New York.

The manner in which we have framed these questions is in no way meant to restrict the Court of Appeals from considering any state law issues that it might wish to resolve in connection with this appeal.

In view of the fact that this case involves the stay of a grant of a preliminary injunction, issued to protected asserted First Amendment rights, we most respectfully request the Court of Appeals to consider on an expedited basis both whether it will accept certification, and, if it does, the questions here certified.

This panel retains jurisdiction pending action by the New York Court of Appeals.

SACK, Circuit Judge (concurring in the judgment):

## I. Introduction

Judge Calabresi's learned exegesis on certification of state-law questions in federal constitutional cases is, in my view, misplaced in our current consideration of an injunction against a prior restraint on artistic expression. In light of the divergence of views among the members of this panel, I concur in the result he proposes nonetheless, concluding that although certification in this case is contrary to the dictates of the First Amendment it will result in a speedier resolution of the plaintiff's right to express himself than will any other practically available alternative. Getting on with this case is less offensive to the First Amendment, I think, than my continuing to argue for a result I view as constitutionally correct but which is, for now at least, unobtainable. While I thus concur in Judge Calabresi's proposed judgment, I see no reason to decide whether the analytical framework he prescribes is correct.

\*  \*  \*

I have little doubt that the City of New York can stop a large group of men and women from undressing on a public street in a residential neighborhood, even if the members of the group do so for the purpose and in the course of creating artistic[1]

1. A description of how Tunick goes about taking his photographs might well leave the impression that he is engaged in a series of sophomoric pranks. Any attempt to evaluate his work based on such a description, however, would be misguided. His photographs have been exhibited in prestigious galleries and reviewed favorably in the mainstream press. A two-page article in the July 12, 1998 issue of *The New York Times Magazine* (p. 49–50) was devoted to four of his pictures and included reproductions of the photographs themselves. And the author of a review in the September 1998 issue of *Harpers Magazine* concluded that an exhibition of Tunick's work at a Manhattan gallery was "[a] good exhibition worth seeing."

Tunick's extended performance works involving masses of people that are recorded via still photography or video tend to diminish their individual presences in favor of an

expression.[2] But governmental prevention of expression before it takes place is a prior restraint. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Any such bar may be accomplished, therefore, only through the enactment of a clear statute meeting constitutional rigors or a regulatory scheme with sufficiently definite standards and procedural safeguards.

The City has chosen to employ neither. Instead it has invoked a statute that, as Judge Calabresi correctly points out, *ante* at 71–72, does not clearly prohibit Tunick's intended actions. The City proposes to allow members of the executive branch of City government physically to prevent Tunick's expressive activity based on their reading of the statutory language. In my view, because the City has chosen to employ neither a permit system nor a clear statute, First Amendment principles leave us with no choice but to lift our stay of the district court's preliminary injunction prohibiting the police from physically restraining Tunick's expression before it occurs.

## II. The City's Licensing System

The City has in place a permitting system "for the taking of photographs ... in or about city property, or in or about any city street." *See* N.Y. City Charter § 1301(l)(r). The City might have attempted to employ that system to deal with Tunick's intended photo shoot in a residential Manhattan neighborhood. "Of course, the [C]ity may require periodic licensing, and may even have special licensing procedures for conduct commonly associated with expression." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 760, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Under a properly structured licensing system, a municipality may constitutionally regulate at least the time, place and manner of expressive activity. *See, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). But a system of licensing speech or other expression is impermissible if it does not contain clear objective standards on the basis of which the licensing authority must act. This deters the licensor from engaging in raw censorship, preventing or unduly restricting speech of which or by people of whom he or she disapproves. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("principal inquiry" in licensing cases is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys.")

Standards provide the guideposts that check the licensor and allow courts

overall schema, which has, let's face it, totalitarian undercurrents.

\*    \*    \*

Tunick's best photographs ride on the prospect that the formal aspect of[ ] depicting repeated human contours in public environments will infer on the fragility of the unprotected human body in industrialized settings. He's surprisingly effective in these best efforts where the confrontation between the public and private spheres in his photographs collide with sufficient impact to engender thoughts on America's evident national schizophrenia—a heritage that always rears its head in weird, in unsuspecting ways, much to the amazement of many, but not all, other countries in the world, *ex.* The Clinton–Lewinsky debacle.

*Harpers Magazine,* September 1998, at 73–74.
   This brief discussion of the value of Tunick's work is consigned to a footnote because it is perfectly irrelevant to the issues to be decided on this appeal. As Judge Calabresi explains, Tunick's photography is undoubtedly entitled to constitutional protection. *See ante* at 82. The First Amendment does not protect expression based on an appraisal of its worth by any government official, including the author of this opinion.

2. The plaintiff properly conceded in the district court that "public nudity, even in furtherance of art, may be restricted." *Cf. Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991)(plurality opinion)(discussing level of protection to be applied to artistic nudity).

quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138 (citation omitted). A "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (footnote containing citations omitted).

We need not review the statutory basis for, or the operation of, the City's licensing system here, however. As Judge Calabresi observes, *ante* at 70, the City has explicitly declined to base its threatened arrest of Tunick and his models upon his failure to obtain a City permit.[3]

### III. The State Criminal–Exposure Statute

Having foregone regulation by licensing, the City intends for the police physically to prevent Tunick and his models from engaging in the photo shoot on the grounds that it will violate §§ 245.01 and 245.02 of the New York State Penal Law. Section 245.01 provides:

A person is guilty of exposure if he appears in a public place in such a manner that the private or intimate parts of his body are unclothed or exposed.

N.Y. Penal Law § 245.01. More meaningfully for Tunick, who does not plan to doff his clothing in order to take the photographs, Penal Law § 245.02 provides:

A person is guilty of promoting the exposure of a person when he knowingly conducts, maintains, owns, manages, operates or furnishes any public premise or place where a person in a public place appears in such a manner that the private or intimate parts of his body are unclothed or exposed.

N.Y. Penal Law § 245.02. But each of these statutes also contains an exception that may cover Tunick's planned photo shoot: "[T]his section shall not apply to the breastfeeding of infants or to any person entertaining or performing in a play, exhibition, show or entertainment." Indeed, Tunick's view is not that this exception *may* apply to his photo shoot, but that it unquestionably *does.* According to his counsel, this statutory language, which is "totally clear and completely unambiguous on its face," Tr. Oral Arg. at 25, permits that which Tunick proposes to do.

The statute gives cities, towns and villages the power to opt out of the exception insofar as it applies to expressive activity, thus allowing such municipalities to enact local laws prohibiting public nudity irrespective of its artistic purpose. N.Y. Penal Law §§ 245.01 and 245.02.[4] While such a local law would render Tunick's planned activity plainly illegal, leaving the issue of whether the prohibition meets First Amendment standards, New York City has chosen not to adopt one. Indeed, New York's licensing authority has deliberately permitted nude photography in public places from time to time.

---

**3.** Whether the City's decision, following our granting of a stay of the district court's injunction, to forego that argument is based on the fact that the district court's injunction did not require the City to issue Tunick a permit, as Judge Calabresi surmises, *ante* at 70, a perceived absence of standards in the City licensing law that makes it constitutionally suspect, or on something else, we do not know.

**4.** Section 245.01 reads, "Nothing in this section shall prevent the adoption by a city, town or village of a local law prohibiting exposure of a person as herein defined in a public place, at any time, whether or not such person is entertaining or performing in a play, exhibition, show or entertainment." Section 245.02 is nearly identical, adding the word "substantially" before the words "as herein defined."

The City has thus both abandoned Tunick's lack of a permit as a basis on which to prevent his planned photo shoot and declined or failed to adopt an ordinance that would make it explicitly unlawful. It has nonetheless decided that despite the statute's exception for artistic activities what Tunick proposes to do is prohibited by §§ 245.01 and 245.02. According to the City, people posing naked in the public streets for the purpose of having their photograph taken for eventual display elsewhere, using the street as a "set" rather than a forum,[5] are not "performing in a play, exhibition, show or entertainment." Neither the plain meaning of the statute, the decision of a New York appellate court, nor any other means by which we might determine the statute's reach is available— to us or to the New York City Police Department—to determine whether the City is right.

In my view, the arrest of Tunick by the police under a statute that does not clearly make his artistic expression unlawful prior to that expression taking place presents the same kind of peril for freedom of expression as does the refusal of a licensing authority to grant a permit under a similarly unclear statute. Unguided by a plain statutory command, the police can permit or restrain Tunick's expression before it occurs for reasons of their own. When a government license is involved, a "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objec-tive, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth*, 394 U.S. at 150–51, 89 S.Ct. 935 (footnote containing citations omitted). I do not see why subjecting the exercise of First Amendment freedoms to a prior restraint imposed *by the police*, without narrow, objective, and definite standards to guide *the police*, is any the more permissible. This variation on the classic theme of censorship is, it seems to me, also foreclosed by the First Amendment.

Police censorship is, if anything, more dangerous than a licensing system. It is pure force unaccompanied by the procedural safeguards that are a constitutionally mandated part of a viable licensing plan. *See, e.g., Beal v. Stern*, 184 F.3d 117, 128 (2d Cir.1999).[6] I do not think that law enforcement officials may stop expressive activity before it begins absent a clear statute making the activity illegal. The police operate under no such clear mandate here.

In sum, the City's arrest of Tunick and his models would prevent his expression. It would thus be a prior restraint and as such has special constitutional significance. As the Supreme Court has explained:

> A criminal penalty or a judgment ... is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct

---

5. Tunick cites but one case—the City none— addressing the constitutionality of a government restriction on the use of a public place as a set. *See Amato v. Wilentz*, 753 F.Supp. 543 (D.N.J.1990) (finding unconstitutional judge's refusal to permit courthouse that was often used by permission as film set to be used by the maker of "Bonfire of the Vanities" because content of scene to be shot "could cause justifiable offense to any black person"), *rev'd on other grounds*, 952 F.2d 742 (3d Cir.1991). Since we do not decide the constitutionality of the New York statute, we need not discuss the relevance or persuasiveness of the decision.

6. [T]he [Supreme] Court [in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)] held that in addition to objective limits on discretion, content-based prior restraints must contain three procedural safeguards. First, the licensor must be required to decide whether to issue the license "within a specified brief period" during which the status quo is maintained, *id.* at 59, 85 S.Ct. 734; second, "a prompt final judicial decision" must be assured, *id.;* and third, the burden of proving that the expression is unprotected must rest with the censor, see *id.* at 58, 85 S.Ct. 734.

*Beal*, 184 F.3d at 128.

or otherwise, does the law's sanction become fully operative.

A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time.

*Nebraska Press Ass'n,* 427 U.S. at 559, 96 S.Ct. 2791 (citing Alexander M. Bickel, *The Morality of Consent* 61 (1975)) (footnote omitted). The prohibition of prior restraints has been understood for centuries to be central to the guarantee of freedom of expression. *See Near v. Minnesota,* 283 U.S. 697, 713–14, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). "The [Supreme] Court has emphasized that '[a] system of prior restraints of expression comes to [the courts] bearing a heavy presumption against its constitutional validity.'" *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)(quoting *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) and *Freedman v. Maryland,* 380 U.S. 51, 57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)) (second alteration in the original). There is no basis for a finding that that fundamental presumption has been overcome here.

## IV. Subsequent Punishment

Prosecution of Tunick or his models under the New York statutes *after* the photography is complete would be another matter. Tunick's counsel made clear at oral argument that the aim of this proceeding was solely "to enjoin a prior restraint. . . . The purpose sought was not to prevent Mr. Tunick from being prosecuted subsequently and hav[ing] the case wend its way through the court[s]."[7] Tr. Oral Arg. at 28. I see no impediment to such after-the-fact action under § 245.01 or § 245.02.

Should the City seek to prosecute Tunick (or his models) they would have available to them in the New York state courts the argument advanced here, that his (or their) activity is—plainly in Tunick's view—protected as a "perform[ance] in a play, exhibition, show or entertainment" under the exceptions contained in §§ 245.01 and 245.02. State courts thus would decide the issue of the meaning of these state statutes. If the New York courts were to decide that Tunick's (or his models') behavior was not exempt under the statutes, he (or they) would then be able to argue the statutes' unconstitutionality. If he (or they) were prosecuted after the fact, his (or their) rights under the Federal Constitution and state constitutional[8] and statutory law would thus be protected. The potential for the " 'friction-generating error' between the federal and state court systems" that Judge Calabresi seeks to avoid, *ante* at 77 (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)), would not arise.

## V. Judge Calabresi's Opinion

I do not write in order to take issue with Judge Calabresi's learned dissertation on

---

7. Plaintiff's counsel explained that "the particular evil to which this injunction was addressed" was "to simply prevent the police from arresting Mr. Tunick before he takes his picture." Tr. Oral Arg. at 29. "[T]he emphasis of this case and the purpose was to prevent [Tunick] from being arrested before his picture could be taken." *Id.* "The litigation," he continued, "was directed toward obtaining an injunction against the prior restraint." *Id.* at 30.

8. Protection for Tunick's expression under the New York State Constitution may well be broader than it is under the First Amendment. *See generally Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 249, 567 N.E.2d 1270, 1278, 566 N.Y.S.2d 906, 914 (1991) ("[T]he protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution." (internal quotation marks and citation omitted.)) Its breadth adds significance to our certification of the New York constitutional question to the Court of Appeals.

certification of state-law questions to state courts in constitutional adjudication.[9] I part company with him because certification in this case will postpone Tunick's speech indefinitely, and in the realm of prior restraints on expression I think that such delay, being unnecessary, is constitutionally intolerable.

This is not to say that Judge Calabresi's approach is wholly insensitive to freedom of speech. *See ante* at 87–89. He recognizes that we cannot ignore "the effect of certification, and its attendant delay" on Tunick's expressional rights. *Id.* at 55, 117 S.Ct. 1055. "This factor," he continues, "is fundamental and, in many contexts, it will outweigh the others and mandate speedy and direct action by the federal court." *Id.*

But Judge Calabresi concludes that in Tunick's particular case "time is not of the essence," *id.* at 88, and that forcing him to wait to speak until the certification process is complete is therefore constitutionally acceptable. I disagree. Every moment's repression of expression presumptively does the public injury. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also New York Times Co. v. United States,* 403 U.S. 713, 714–15, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring) ("[E]very moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment.") Close to the heart of the presumption against the validity of prior restraints is the notion that a prospective speaker may not be forced to litigate the lawfulness of his or her speech beforehand, as Tunick would be forced to do under Judge Calabresi's approach.

I am wary of making unnecessary distinctions, as I think Judge Calabresi does, between speech that we find to be urgent and that which we think can bide its time. We ought not to be determining what speech is pressing and what can suffer the law's delay. That, like deciding what speech is important and what unimportant, is not for the courts. For us to determine relative urgency would be disturbingly similar to our deciding what is and is not "newsworthy," an endeavor that we have been instructed to avoid. *See Harper & Row Publishers, Inc. v. Nation Enter's, Inc.,* 471 U.S. 539, 561, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (commenting in a copyright case that " '[courts] should be chary of deciding what is and what is not news,' " (quoting Judge Meskill, of this Court, dissenting from the decision of this Court there under review, *Harper & Row Publishers, Inc. v. Nation Enter's, Inc.,* 723 F.2d 195, 215 (2d Cir.1983))); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("We doubt the wisdom of committing th[e] task [of deciding on an *ad hoc* basis which publications address issues of 'general or public interest'] to the conscience of judges."); *Lerman v. Flynt Distrib. Co.,* 745 F.2d 123, 139 (2d Cir.1984)("Courts are, and should be, reluctant to attempt to define newsworthiness."), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Harper & Row Publishers, Inc. v. Nation Enter's, Inc.,* 723 F.2d 195, 207 (2d Cir.1983)("We fully agree with our brother Meskill that courts should be 'chary' of deciding what is and what is not news."), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

Even the "Pentagon Papers," dealing though they did with matters of life and

---

**9.** I do note that *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), upon which Judge Calabresi builds his argument, did not involve a prior restraint on expression. The Court also did not suggest that even in the case before it certification was mandatory—it decided merely that "the certification requests merited more respectful consideration than they [had] received" in the Ninth Circuit. *Id.* at 78, 117 S.Ct. 1055.

death, war and peace, were arguably historical material not being published on deadline. *See* David Rudenstine, *The Day the Presses Stopped* 48 ("Throughout the ['Pentagon Papers'] litigation and thereafter the [*New York*] *Times* publicly took the position that the Pentagon Papers study was nothing but a history with absolutely no relevance to current military, diplomatic, and intelligence interests.") That did not make the lifting of the prior restraint against their publication any the less urgent. *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The Supreme Court did not content itself with an observation that Daniel Ellsberg and the *New York Times* retained an interest in publishing the documents, and that consequently "time [was] not of the essence," *cf. ante* at 88, permitting the Court to consider the case in a more leisurely fashion.

I have no reason to doubt that Judge Calabresi's solution to the problem before us is a refined analysis of the respective roles of state and federal courts confronted with a federal constitutional question about a state statute. It does not, however, determine the proper procedure to be employed here because it does not sufficiently take into account First Amendment values in the discrete context of a looming prior restraint.

## VI. Conclusion

I would lift the stay of the district court's injunction and remand the case for that court, in consultation with Tunick, to fix a date for the taking of the photographs. The district court would then reenter an injunction prohibiting the City of New York and its agents from interfering with Tunick or his models in the taking of the photographs, assuming of course that no statute clearly criminalizing their planned behavior has become law in the interim. In this way we would protect

Tunick's right to engage in the expression at issue without the delay inherent in a lengthy certification process, albeit at some risk of subsequent punishment. And we would do so in a manner that did not trench upon principles of federalism.

But I find myself alone in my views. I therefore join the result proposed by Judge Calabresi, which thus becomes the judgment of the Court. This seems to me to be preferable to joining Judge Van Graafeiland's conclusion, which at the time of this writing, at least, would result in our abjuring a decision on this appeal, returning Tunick to the position he was in last July. And I see nothing to be gained from my holding out any longer for my own view.[10] Because it is my belief that time is *always* of the essence when it comes to speech, I do hope that the New York Court of Appeals will find a way to be more expeditious in deciding whether to accept this certification and, if they do accept it, in deciding the certified questions, than we have been in deciding to certify them in the first place.

VAN GRAAFEILAND, Senior Circuit Judge, dissenting:

Before addressing the merits of my colleagues' separate opinions, I deem it necessary to review the chronology of events which my colleagues believed created such a need for haste as to justify the filing of their opinions without giving me an opportunity to read and respond to them. As is evident from the following several paragraphs, the issue of unseemly haste has been in this case from the very outset.

On July 13, 1999, Tunick filed his complaint which sought the following relief:

A preliminary and permanent injunction, enjoining defendants from interfering with plaintiff Tunick's planned July 18, 1999 photoshoot, as long as it takes place between 5:30 a.m. and 6:30 a.m. and consists of 75–100 nude models in

---

10. *Cf. Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 354, 94 S.Ct. 2997, 41 L.Ed.2d 789 (Blackmun, J., concurring) ("If my vote were not needed to create a majority, I would adhere to my ... view. A definitive ruling, however, is paramount." (citations omitted)).

the form of an abstract shape on Madison Street, and from arresting Tunick and/or his models.

On the same day he served an order to show cause in which he sought the following injunctive relief:

Upon the annexed Affirmation of Ronald L. Kuby, duly executed on the 13th day of July, 1999, the Exhibits thereto, and the Complaint and Memorandum of Law filed herewith, let defendants show cause, at the Courthouse, 500 Pearl Street, New York County, Room 23B, on July 15, 1999, at 4:30 o'clock in the afternoon, why an Order should not issue enjoining defendants, their employees and agents, from interfering with or otherwise arresting Spencer Tunick, and 75–100 nude models, forming an abstract shape on Madison Street, between 5:30 a.m. and 6:30 a.m. on July 18, 1999.

Following a hearing conducted on July 15, 1999, the district court on July 16 issued an OPINION AND ORDER in which the relief sought by Tunick was described in the following language:

Plaintiff Spencer Tunick seeks a preliminary injunction that will enjoin defendants from arresting or interfering with Tunick and 75 to 100 nude models, to be placed in an abstract formation on Madison Street between Catherine and Market streets at 5:30 a.m. on Sunday July 18, 1999.

The court then concluded its grant of injunction with the following language:

I do not think that the proposed photo shoot at 5:30 a.m. on a Sunday morning given the brevity of the actual nudity threatens the privacy rights of the block's residents or presents overwhelming concerns for traffic or safety which should bar the photo shoot from taking place.

Most importantly, given the fact that the City has been unable to offer a single alternative location, I am not convinced that the time, place and manner restriction is narrowly tailored or that it

is [sic] has no reference to the content of the regulated speech. Having first suggested alternative sites might be agreeable and then failing to pinpoint a single alternative location, the City cannot expect this Court to simply take its word that the restriction is reasonable and that the proposed location and date is an inappropriate time and place for the nude photo shoot. Accordingly, the photo shoot will proceed on Sunday morning at 5:30 a.m. at the proposed location but it shall not last beyond 6:30 a.m. and the nudity of the models will be limited to the representation given by plaintiff. The Police Department is directed to provide a suitable police presence.

For the reasons set forth above, the plaintiff's motion for a preliminary injunction is GRANTED.

On July 16, 1999, defendants appealed the above-quoted grant of preliminary relief to this Court. I believe that the allowance of only four days between the institution of suit with the concurrent application for injunctive relief and the date of the challenged photo shoot resulted from either improper dawdling on Tunick's part, *see United States v. Pate,* 418 F.2d 815 (7th Cir.1969), or was designed deliberately to deprive Safir of sufficient time to arrange an alternative shoot location. In either event, it constituted an adequate explanation for why the City was unable to "offer a single alternative location" as the district court held. I believe that the district court erred in holding that Safir could not assert a time, place and manner defense.

On Saturday morning, July 17, 1999, a panel of judges, who are not identified in the docket sheet, conducted an expedited hearing on defendants' challenge to the July 16th injunction order. Because of the absence of both a court clerk and a stenographer, the hearing was neither transcribed nor reported and no written orders were issued. Accordingly, we cannot state with certainty what transpired between Court and counsel. For example, the dis-

trict court's stated reliance on the "representation given by plaintiff" covering the limitation of the nudity of the models is meaningless in the absence of any evidence concerning the "limitation." The docket sheet shows only that the district court's injunction order was "stayed" and an "expedited appeal" was ordered with a three-week briefing schedule. In appellants' subsequently submitted brief they requested that the above-quoted preliminary injunction order "be reversed and the preliminary injunction vacated." Appellants' brief at 17. Appellee argues that "the preliminary injunction issued by the District Court should be affirmed." Appellee's brief at 32. These constitute the essence of the litigation.

Two months later, on September 13, 1999, when the appeal was argued, Judge Calabresi requested that trial counsel within a week submit letter briefs responding to the following questions:

1. Whether the permit system under which the City denied plaintiff an opportunity to conduct a photographic session involving unclothed models violates the First Amendment prohibition against licensing regimes that confer excessive discretion upon the licensor of expressive activity.

2. Whether the City's refusal to grant plaintiff a permit to conduct a photographic session amounts to content-based discrimination which cannot be shown to be "necessary" and "narrowly tailored" in the pursuit of "compelling interests."

3. Whether, even if not content-based, the City's blanket prohibition against the filming of any scene involving unclothed performers can be found to be a "narrowly tailored" "time, place or manner" restriction.

4. Whether, on the basis of any or all of the First Amendment principles suggested in the first three questions presented, the District Court properly found that plaintiff demonstrated a likelihood of success on the merits and irreparable injury.

Tunick, who brought this suit in federal court alleging a violation of his First and Fourth Amendment rights, responded to Judge Calabresi's request by respectfully requesting that the Court deny certification. Safir responded by suggesting that the court certify the question whether "the participants in plaintiff's proposed shoot are covered by the 'entertaining or performing' exemption of Penal Law §§ 245.01 and 245.02."

Judge Sack advised me and Judge Calabresi that he did not agree with the proposed certification, and I expressed my agreement with that portion of Judge Sack's response. Another three months elapsed with no further action on the part of Judge Calabresi until, on March 10, 2000, he circulated a 46–page opinion ordering the following different set of proposed certified questions:

(1) Whether a photographic shoot involving 75 to 100 nude bodies arranged in an abstract formation on a public street constitutes entertainment or performance in a "play, exhibition, show or entertainment" within the meaning of the exception to N.Y. Pen. Law § 245.01 and § 245.02.

(2) If the answer to the first question is yes, whether the exceptions to N.Y. Pen. Law § 245.01 and § 245.02 are limited to indoor activities.

(3) If the answer to the first question is no, or if the answers to the first and second questions are both yes, whether N.Y. Pen. Law § 245.01 and § 245.02, so interpreted, are valid under the Constitution of the State of New York.

Question (3), which refers to the New York Constitution, is completely new. The New York Constitution played no role whatever in this case prior to Judge Calabresi's rather obvious effort to justify certification. As is evidenced by the originally proposed questions, the instant action was specifically and unequivocally based

on alleged violations of the First and Fourteenth Amendments. The New York Constitution was discussed by neither the district court nor counsel. The clearest evidence of Judge Calabresi's purpose is paragraph (3) which drags the New York Constitution into the case. Ever since Judge Calabresi moved to this Court from Yale Law School, he has verbosely crusaded for more extensive use of the certification process. In so doing, he has either overlooked or disregarded the burdens on the State courts and the consequent delays that often result. Clearly, as former Justice Douglas stated when dissenting in *Clay v. Sun Ins. Office, Ltd.*, 363 U.S. 207, 228, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960), "[t]he pursuit of justice is not an academic exercise."

I find the discussion of these issues by then District Judge Jose Cabranes in *L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc.*, 629 F.Supp. 1419, 1422–25 (D.Conn. 1986), more persuasive than Judge Calabresi's lengthy discourse. See also Judge Meskill's discussion in *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir.1997), where, quoting *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir.1988), he said that "Certification should not be used as 'a device for shifting burdens of this Court to those whose burdens are at least as great.'" (An apt description of the New York Court of Appeals.) It also should not unnecessarily impose upon the New York Court of Appeals the obviously unpleasant task of refusing to accept questions certified by this Court. *See, e.g., Yesil v. Reno*, 92 N.Y.2d 455, 682 N.Y.S.2d 663, 705 N.E.2d 655 (1998), in which the New York Court of Appeals declined to accept certification ordered in *Henderson v. INS*, 157 F.3d 106 (1998)(Calabresi, *J.*). Judge Calabresi warmed up for his present discourse on certification by writing a 17–page dissent in *McCarthy.*

I would not be as vehement as I am in this matter if I was satisfied that this Court had jurisdiction to hear the instant appeal. As above stated, Tunick's complaint sought an injunction addressed specifically to his planned July 18, 1999 photo shoot. The injunction he secured referred only to the proposed July 18, 1999 shoot, directed that the shoot take place on that day, and directed the New York City Police Department to "provide a suitable police presence," a clear indication it would seem that the district court anticipated trouble arising from the presence of 75 to 100 nude men and women on a public street in a residential neighborhood on the prescribed date.

It has been stated on numerous occasions that "to invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). There is no way in which this Court at this late date could grant Tunick the relief he sought and the district court ordered. In the words of the Seventh Circuit in *Johnson–Kennedy Radio Corp. v. Chicago Bears Football Club, Inc.*, 97 F.2d 223, 225 (7th Cir.1938), "[t]he subject matter of the litigation has passed into history." *Johnson* involved an injunction seeking to prevent a football game that already had been played. *See also Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *American Book Co. v. Kansas ex rel. Nichols*, 193 U.S. 49, 24 S.Ct. 394, 48 L.Ed. 613 (1904); *Todd v. Joint Apprenticeship Comm.*, 332 F.2d 243, 246–47 (7th Cir.1964); *Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F.Supp. 667, 678 (N.D.Ill.1976); *Fowler v. United States*, 258 F.Supp. 638 (C.D.Cal. 1966).

In short, the instant case is not one which involves a general allegedly wrongful practice that may permit jurisdiction on the ground that the alleged wrongdoing is repetitive in nature. The injunction at issue was directed solely against a single

event scheduled for July 18, 1999. "No relief within the scope of the complaint could now be granted." *Todd,* 332 F.2d at 247. In the same vein, I do not understand why my colleagues were in such a rush to request certification that they did so before I had a reasonable opportunity to state my opposition.

Although my opposition to certification does not address the merits of the instant appeal, I, like Judge Sack, have "little doubt that the City of New York can stop a large group of men and women from undressing on a public street in a residential neighborhood, even if the members of the group do so for the purpose and in the course of creating artistic expression." Maj. op. at 69. *See City of Erie v. Pap's A.M.,* No. 98–1161, 2000 WL 313381 (U.S. Mar.29, 2000) (city ordinance banning public nudity constitutional); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) ("[A] city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect."); *Buzzetti v. City of New York,* 140 F.3d 134, 140 (2d Cir.), *cert. denied,* 525 U.S. 816, 119 S.Ct. 54, 142 L.Ed.2d 42 (1998); *People v. Hollman,* 68 N.Y.2d 202, 207, 507 N.Y.S.2d 977, 500 N.E.2d 297 (1986) ("prohibiting public nudity is plainly within the State's police powers."). I am firmly convinced that the proposed photo shoot of 75–100 naked people on a public street will constitute an open but regrettable invitation for voyeurs and impressionable children to bring their cameras and join in the shoot.

Because Tunick's complaint and order to show cause were served just five days prior to the scheduled photo shoot, it was totally unreasonable to expect an opinion from this Court passing upon the merits of the challenged shoot prior to the clicking of the cameras. We do not know what prompted Tunick's unseemly rush to the courts, a rush that was unnecessarily unfair to both the judiciary and the public. I would dismiss the complaint as moot with-out prejudice to Tunick's scheduling another photo shoot in a manner that permits a reasonable time for prior judicial review.